744 So.2d 515 (1999)
C.C.A., Appellant,
v.
J.M.A., Appellee.
No. 98-02695.
District Court of Appeal of Florida, Second District.
October 6, 1999.
Larry K. Coleman, Bradenton, for Appellant.
Richard R. Garland of Dickinson & Gibbons, P.A., Sarasota, for Appellee.
NORTHCUTT, Judge.
In this dissolution of marriage case, the sole issue on appeal is whether the circuit court correctly held that the husband, J.M.A., has no "duties or responsibilities for" a minor child conceived and born during the marriage. We agree with the wife and mother, C.C.A., that equitable estoppel bars J.M.A. from contending he has no *516 obligations to the child. We reverse and remand with directions to determine J.M.A.'s rights and responsibilities as the child's legal father. In all other respects, we affirm the judgment dissolving the marriage.
Most of the circumstances of this case are unusual, but one of them has become increasingly common in Florida case law: the parties concede that the husband is not the child's biological father. See generally Chris W. Altenbernd, Quasi-Marital Children: The Common Law's Failure in Privette and Daniel Calls for Statutory Reform, 26 Fla. St. U.L.Rev. 219 (1999) (referring to a child conceived and born during a marriage who is not the husband's biological offspring as a Type II quasi-marital child).
When C.C.A. and J.M.A. married, they agreed not to have children. In 1990, J.M.A. had a vasectomy. Then in 1992, the couple began revisiting the possibility of having children. The husband did not want to attempt a surgical reversal of his vasectomy, so the parties considered recruiting a surrogate to father a child. The husband nominated his good friend and co-worker for the role, and he approached his friend with the couple's proposal. The friend agreed and had sexual relations with C.C.A. that resulted in a pregnancy. Unfortunately, the pregnancy ended in a miscarriage. The parties became concerned about the surrogate's emotional response to the loss, and decided not to use him again.
At this point, the parties' versions of events diverge. At trial the husband claimed that after the miscarriage he decided that having a child was not a good idea, and that the wife agreed they would not do so. The wife did not recall this conversation. It is undisputed, though, that the wife conceived a child with another man, whom the couple may or may not have considered as a surrogate before the first pregnancy, without the husband's prior knowledge. C.C.A. claimed that the conception was pursuant to the couple's agreement to use a surrogate to father a child. She testified that she would have terminated the pregnancy if she had not believed that J.M.A. wanted the child and wanted to be its father. The husband did not recall any conversation about terminating the pregnancy, but he stated that he knew abortion was not acceptable to C.C.A. He agreed they would stay together, he supported C.C.A.'s decision to have the baby, and he implied he would do his best to serve as the baby's father.
When C.C.A. first conceived with the husband's co-worker, J.M.A. advised friends that his vasectomy had been reversed. When the second conception occurred, J.M.A. told friends and co-workers that he was excited and happy about his wife's pregnancy, and he acted accordingly. He attended the child's birth, signed the child's birth and baptismal certificates as the father, and named the child after his grandparent. He designated the child as an heir in his will, and named the child as a dependent on his tax returns and as a beneficiary on his insurance policies. He held himself out as the child's father to the child, colleagues at work, his family and the couple's friends. The only people outside the marriage who knew that J.M.A. was not the child's father were the men who had acted as surrogates.
C.C.A.'s petition for dissolution alleged that one child had been born of the marriage. In his first answer, J.M.A. admitted this allegation. About one month later, he amended his answer to deny the allegation, and raised the defense that he was not the child's biological father. Then, several months later, J.M.A. orally stipulated to amend his answer and to withdraw his challenge to the paternity of the child. Almost a year after that, he moved to amend his pleadings to again contest the child's paternity. The court permitted the amendment, and the wife responded with three affirmative defenses to the paternity challenge: that J.M.A. was equitably estopped, that he contracted to support the *517 child, and that he was estopped by his pleadings in the case.
The circuit court held that J.M.A. had not agreed or contracted to support the child. While we may have a different view of the facts in this case, we cannot say that the court abused its discretion in so ruling. See Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980). We need not address the court's ruling that J.M.A. was not estopped by his pleadings, because its ruling that he was not equitably estopped from denying his responsibility to the child was an abuse of discretion.
We first note that nothing in Daniel v. Daniel, 695 So.2d 1253 (Fla.1997), which the circuit court correctly found controlling, changes the rule that equitable estoppel may compel a husband to support a child that is not biologically his own. Florida courts have held husbands in this situation to be equitably estopped both before and after the Daniel decision. See White v. White, 710 So.2d 208 (Fla. 1st DCA 1998); Wade v. Wade, 536 So.2d 1158 (Fla. 1st DCA 1988); Marshall v. Marshall, 386 So.2d 11 (Fla. 5th DCA 1980).
As the Marshall court pointed out, the doctrine of equitable estoppel precludes a person from maintaining inconsistent positions to the detriment of others. While the wife may not have suffered any detriment in that case, the court looked to whether the child's position had been altered. See Marshall, 386 So.2d at 12. The Wade court focused both on the benefits the husband enjoyed because of his representation that he was the child's father, and on detriment the child suffered because he was induced to believe that Mr. Wade was his father. See 536 So.2d at 1160.
With one exception, the facts of this case mirror the facts in Wade. We previously have recited the many ways in which J.M.A. acted as this child's father. J.M.A. enjoyed the same benefits as Mr. Wade: the child's love, his status as a father in place of the biological father, and his place in the community as a father. His child suffered the same detriment as the Wade child: the child was induced to believe J.M.A. was its father, thereby preventing the child from knowing the biological father or receiving support from that man. See also White, 710 So.2d at 209 (relying on Marshall and Wade to hold that husband was equitably estopped to deny responsibility for non-biological child when he and his wife had discussed having a child and he had for many years treated the child as his own). The only difference between the two cases is in the age of the children. The Wade child was nine years old; here, at the time of the parties' separation their child was almost two and one half years old.
The circuit court determined that Wade and White were inapplicable to this case. In doing so, it abused its discretion. Like the facts in those cases, these facts establish equitable estoppel. We decline to draw a bright line concerning the length of time the father/child relationship must exist before estoppel may be applied, but we hold that over two years is sufficient. J.M.A. is equitably estopped to disavow his status as this child's legal father. We remand for proceedings to establish J.M.A.'s rights and responsibilities as such.
Reversed and remanded.
ALTENBERND, A.C.J., and CASANUEVA, J., Concur.